**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

PSEG POWER NEW YORK, INC.,

                                        Plaintiff


            - v -                                        1:05-CV-657
                                                         (DNH/RFT)

ALBERICI CONSTRUCTORS, INC.,

                                        Defendant.

_____

APPEARANCES:            F              T    OF COUNSEL:


NIXON PEABODY LLP                           DANIEL J. HURTEAU, ESQ.
_Attorney for Plaintiff_
Omni Plaza, Suite 900
30 South Pearl Street
Albany, New York 12207


ERNSTROM & DRESTE LLP                       MARTHA A. CONNOLLY, ESQ.
_Attorney for Defendant_
180 Canal View Boulevard, Suite 600
Rochester, New York 14623


**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**



## MEMORANDUM-DECISION and ORDER

With the rapid and sweeping advent of electronic discovery, the litigation landscape has been

radically altered in terms of scope, mechanism, cost, and perplexity.  This landscape may be littered

with more casualties than successes and the discovery imbroglio in this case is a prime example of

this observation.  For nearly six months, the parties and the Court have been grappling with an

electronic discovery monstrosity with the hope that it could be corralled and definitively resolved,

thereby obviating the need for motion practice.  Alas, attempts to resolve the issue in lieu of briefs

fell woefully beyond the parties' grasp and, as the last straw, they have set the matter at our feet for appropriate resolution.

Not only does this Court have to decide whether PSEG has to re-produce 3000 emails and their corresponding attachments co-joined, which is no small task, and who would bear the costs of such production, no nominal sum either, but we also must determine whether PSEG's Motion for Summary Judgment (Dkt. No. 39) may proceed without pursuing expert disclosure. In this respect, this Court issued an Order scheduling the briefing as to these issues. Text Order, dated May 30, 2007. Initially, the parties addressed these three narrow albeit complex issues. Dkt. Nos. 51, Def.'s Lt.-Br., dated June 11, 2007, with Exs.; 52, Pl.'s Lt.-Br., dated June 22, 2007, with Exs.; 53, Def.'s Lt-Br, dated June 22, 2007, with Exs.; 54, Pl.'s Lt-Br., dated June 22, 2007, with Exs. In short, Alberici seeks to compel PSEG to produce all electronically stored emails, numbering approximately 3000, conjunctively with their corresponding attachments as "married" documents, imposing the cost of production upon PSEG, and argues that all discovery should be completed before dispositive motions can be pursued. On the other hand, PSEG resists being compelled to produce and/or bear the cost of production of these emails and their corresponding attachments that became irretrievably separated during the discovery production process, and furthermore advocates that the parties should not have to wait any longer for a possible dispositive result or participate in expensive expert discovery before pursuing dispositive motions. But, these limited matters went slightly awry when Alberici interjected claims of spoilation and demand for its corollary, sanctions, into this commixture of issues (Dkt. No. 55, Def.'s Lt.-Br., dated June 29, 2007), which not only raised PSEG's ire but compelled a vociferous response (Dkt. No. 57, Pl.'s Lt.-Br., dated July 10, 2007). However, without resolution of the e-discovery issue, any claim of spoilation is not ripe. To place the overall

discussion on more steady keel we clarified for the parties that we would not address the issue of spoilation now but would only consider the burden of production and the cost of such production. Text Order, dated July 11, 2007.

## I.  HISTORY

### A.  The Nature of the Litigation

To appreciate the scope of this e-discovery dispute, it is necessary to briefly recite the nature of this lawsuit.  This lawsuit arises out of a November 2003 construction contract between PSEG and Alberici under which Alberici was the principal contractor for a project described as the balance of the plant mechanical installation for the Bethlehem Energy Center, located in Glenmont, New York (hereinafter "the Project").  Dkt. No. 1, Compl.  The Project involved the construction of a combined-cycle power plant at the Albany Steam Station.  On May 27, 2005, PSEG commenced this action seeking damages from Alberici for liquidated damages in the amount of $1,661,000.00, work performed by others in the amount of $1,957,728.00, costs of roof drain installation not performed in the amount of $450,000.00, and a refund for allegedly non-conforming work in the amount of $300,000.00, totaling $4,400,000.00.  Succinctly, PSEG's claims are facially based upon Alberici's failure to meet several milestones and agreed upon deadlines under the Contract, PSEG's entitlement to certain credits for work removed from the Contract and a refund for allegedly defective work.

On June 17, 2005, prior to Alberici serving and filing its Answer with Counterclaims, Alberici filed a mechanic's lien in the amount of $6,814,070.68 in the Albany County Clerk's Office.  This mechanic's lien was concomitantly served upon PSEG and the Town of Bethlehem Industrial Development Agency, the fee owners of the property.  The amount of this lien is premised upon an agreed upon price for labor and materials in the amount of $25,027,814.00, which sum includes

original contract work, change order/extra work, pending change order work, open FCMs, and allowed credit. Approximately a month later, on July 20, 2005, Alberici filed its Answer with Counterclaims, asserting, *inter alia*, fourteen (14) Affirmative Defenses and two Counterclaims sounding in a breach of contract and unjust enrichment. Dkt. No. 5, First Answer. Alberici's Counterclaims for "original work, changed work, and extra work" amounts to $11,422,644.94. Dkt. No. 27, Am. Answer, at ¶¶ 115 & 127.

**B. Discovery**

In material respects the parties do not disagree as to what transpired during the discovery process. Alberici's First Request for Production included, *inter alia*, a demand for "documents [which] shall include but is not limited to, . . . emails . . . and all other documentary material including . . . other material contained therein or attached thereto[.]" Dkt. No. 51 at p. 2. A massive quantity of documents, encompassing more than 211,000 pages were produced in hard copy form by PSEG over a six month period in 2006.[1]  At its own expense, Alberici had these hard copies converted to TIFF[2] files and uploaded to a litigation support package in order to become searchable. *Id*. at p. 3. Also a disc with emails was provided by PSEG but absent were the related attachments. Dkt. No. 51, Ex. D, Def.'s Lt., dated Feb. 1, 2007.

In January 2007, it became evident to Alberici that PSEG had produced emails without the attachments which were referenced as being a part of the emails. Apparently a technical glitch

---

[1] Alberici wants us to know that they too produced an extraordinary quantity of documents in hard copy form, including electronic materials that encompassed emails and attachments. Dkt. No. 51 at n.1. It also wants us to understand that it bore the cost of that massive production. *Id*.

[2] A Tagged Image File Format (abbreviated as TIFF) is a flexible and adaptable  file format for storing images and documents used worldwide. TIFF files use LZW lossless compression without distorting or losing the quality due to the compression. In layman's terms, TIFF is very much like taking a mirror image of many documents in format that can be compressed for storage purposes.

occurred whereby numerous emails were "divorced" from their attachments caused by limitations in the downloading software. Dkt. No. 51 at p. 1, Ex. F, Pl.'s Lt., dated Feb. 20, 2007. The separation of the emails from the attachments happened at the interface between the different software used by PSEG and the vendor when reducing the documents in a form that could be reviewed by counsel. *Id.* It appears that the "vendor's software was not compatible with the HTML format in which PSEG had provided its documents and that this incompatibility had resulted in the parent child link between the emails and attachments being broken." Dkt. No. 51 at p. 5. Upon discovering this dilemma, the parties immediately engaged in a dialogue to determine if a reasonable solution to this technological snafu was feasible. Much to our chagrin, remarrying the emails to their attachments will be formidable and costly.

Various potential solutions were attempted over the next several months. First, PSEG provided Alberici with a searchable excel spreadsheet. Supposedly, by searching the spreadsheet for the file name of the referenced attachment, Alberici would presumably be able to locate the Bate Stamp number of the attachment. Then using its own litigation support package, Alberici would be able to locate the actual attachment. To the parties' regret, this process did not work for Alberici as it was unable to locate most of the attachments. Dkt. No. 51 at p. 5, Ex. G, Def.'s Lt., dated Feb. 27, 2007. At this juncture, the Court was invited into a discourse on this discovery mire. *Id.* at Exs. H-Q; Dkt. Nos. 40, 42, 43, 45-47, 49, & 50.

Throughout this ordeal, the raw data was not lost. All 750 gigabytes of unfiltered data remained intact in its original format. Dkt. Nos. 54, n.5; 57 at p. 4. Realizing that the underlying data still existed, the next proposal included PSEG sharing with Alberici's vendor a sample of the metadata for analysis. However, the dearth of metadata related to the emails and attachments

rendered this proposal fruitless.  *Id*.  In the interim, the parties' vendors explored other ways to reverse engineer the available data and "re-marry" the attachments to their emails.  This exploration was for naught inasmuch as the data necessary to complete this task was destroyed during PSEG's collection and formatting of the emails.  *Id*.

Not lacking for other creative solutions, PSEG proposed that Alberici identify the missing attachments that they may need for the next round of depositions.  Pursuant to this audit approach, Alberici requested 82 email attachments referenced in 52 emails.  Dkt. No. 55 at p. 4.  PSEG states that they produced approximately 49 emails with 82 attachments at considerable expense and time to it (Dkt. No. 54 at p. 2) whereas, Alberici submits it only received 23 attachments, less than half of what was requested (Dkt. Nos. 51 at p. 10, Ex. M; & 55 at p. 4).[3]  Next, because the PST[4] files with the "conjoined e-mails and attachment in their original form" still existed, PSEG proposed that Alberici give an accounting of the number of PSEG emails which were missing their attachments and identify the custodian of those emails, which Alberici did.  Dkt .No. 51 at p. 7.  The purpose for this information was to aid in estimating the probable costs of producing a set of these emails.  Alberici complains that PSEG did not provide any information pertaining to the PST files as promised.  *Id*.  Lastly, on May 15, PSEG outlined two options for addressing the recovery of these emails and attachments.  Dkt. No. 51, Ex. N., Pl.'s Lt., dated May 15, 2007.  Based upon consultations with its vendor, PSEG estimated that the cost to retrieve these emails would be

---

[3]  On May 23, 2007, 62 additional attachments were delivered to Alberici.  It is uncertain whether these 62 attachments are related to Alberici's request for the 82 attachments.  Dkt. No. 55 at pp. 4-5.

[4]  PST is a filename extension used with certain Microsoft window products wherein messages, calendars, and other items are delivered to and stored on the server.  For example, when a message is created, Microsoft Outlook saves the information in a personal folder file on the computer.  The date file is called a personal folder because it is saved locally in a PST file extension.

approximately $206,000 and proposed that if Alberici wanted them to forge ahead with this option, Alberici would have to carry the cost, or alternatively, Alberici could identify those emails necessary to a claim or defense and PSEG would provide those few documents at no cost to Alberici.  Dkt. No. 51 at p. 7, Ex. N.  After conferring with its consultant, Alberici advised PSEG that it could collect these emails for far less, $37,500.  *Id*., Ex. O; Dkt. No. 57 at p. 5, n.11 ("[The] potential cost of a re-do is anywhere between $40,000 and 200,000[.]").  Alberici's counter proposal was rejected by PSEG.  PSEG was concerned about allowing Alberici's consultant license to wander through its electronic database and view other confidential information not related to this case.  Acknowledging that this was a legitimate concern, the Court proposed a protective order in order to maintain PSEG's proprietary and confidential information, yet PSEG persisted in rejecting Alberici's proposal.

## II. DISCUSSION

A.  Progressing with a Motion for Summary Judgment.

On January 22, 2007, PSEG filed a Motion for Summary Judgment, returnable on February 23, 2007.  Dkt. No. 39, Mot. for Summ. J.  By a Text Order, dated January 23, 2007, the Honorable David N. Hurd, United States District Judge, *sua sponte*, struck PSEG's Motion from the docket and stated that "the parties are hereby directed to renew the motion **upon conclusion of discovery and after consultation with Magistrate Treece**." (emphasis added).  With the exception of this e-discovery debacle, all factual discovery was to be completed by May 30, 2007.  Text Order, dated Mar. 29, 2007.[5]  However, a date for expert discovery was never set.  It was contemplated that the parties would wade through the sea of factual discovery before embarking on expert discovery.  The

---

[5] There is a probability that some depositions remain incomplete and that a second round of depositions may be required.

plan was to convene another conference to determine the necessity of experts and, if so, how much time would be needed to complete that task.

PSEG is anxious to proceed with its Motion for Summary Judgment. It asserts that there is no legal justification to postpone any longer the motion process and that experts are not necessary. Dkt. No. 52. Conversely, Alberici notes that both fact and expert discovery remain outstanding and that expert disclosure is vital to its opposition to the Motion. Alberici anticipates filing an expert affidavit laden with facts to oppose the Motion. Furthermore, depending on this Court's rulings as to e-discovery, there may yet be another round of depositions. Dkt. No. 53.

This Court agrees with Alberici's assessment that experts may be critical to the Motion for Summary Judgment and Alberici should not be precluded from producing such testimony. Moreover, the District Judge was rather definitive as to what must occur before the Motion for Summary Judgment can be renewed. Judge Hurd emphatically pronounced a simple, two-step process before the Motion can be reconstituted: (1) discovery must be concluded and (2) the parties must confer with the Magistrate Judge. At this stage of the litigation, we are far from completing both factual and expert disclosure. All would be better served if disclosure was entirely completed before embarking upon dispositive motions. Therefore, we will not permit the Motion to proceed at this juncture.

## B. Discovery of Emails

At first blush, one would assume that Alberici is entitled to the 3000 or more emails and their corresponding attachments, in light of the fact that PSEG had provided all of these documents in hard copy. Yet, PSEG has juxtaposed its various positions in such a way that such an assumption is uncertain. Only in a very limited context has PSEG objected that these emails are irrelevant,

privileged, or beyond the reach of Alberici. It raised that the scope of this email production may be too broad, encompassing some irrelevant emails. Under this scenario, the debate over relevance should be done after specific emails are identified. Nonetheless, the issues are several-fold: (1) is Alberici entitled to receive the emails with the related attachments together as opposed to their current state of separation, lacking coordinated identification with each other; (2) although PSEG has provided these emails and attachments in hard copy albeit not "married," is PSEG obligated to provide these documents in their original format; and (3) if re-production is required, which party bears the cost of this production?

At the time of the first production, these emails and their attachments were inadvertently divorced because of the incompatibility of PSEG's internal computer software and its vendor's software as they attempted to put all of these downloaded documents into a reviewable and searchable format. None of the raw and unfiltered data was lost in the process and can still can be found on PSEG's computer system. Because the documents exist in its original PST files with nothing destroyed nor rendered irretrievable, the emails can be matched to their respective attachments by returning to the unfiltered data and running another search to find them. However, the remarrying of the emails to their rightful attachments, a duplication of the previous process of production, would indeed create further costs, which PSEG is not willing to bear even though its agents caused the production anomaly.

PSEG's perspective is that Alberici is impermissibly seeking a "perfect" or "ideal" production, regardless of expense or benefit. PSEG firmly rejects Alberici's demand to complete a "re-do," especially at its expense. Such a re-do effort would be duplicative and entirely unnecessary in its view. As an alternative, although this method had been considered once before,

PSEG wants Alberici to identify a concise group of attachments that are important and necessary to Alberici and then it would consider producing said attachments, however, reserving its right to assert that it may be irrelevant or non-responsive or privileged. Dkt. No. 54 at p. 4. Or, if Alberici insists on a re-production, PSEG is willing to provide them but at Alberici's expense. *Id*. at p. 5.

Although it had been a long time coming, the Federal Rules of Civil Procedure have been amended to address electronic discovery. These amendments took effect on December 1, 2006. Because this case was initiated prior to these amendments and disclosure of electronic information was shared without consideration of these new amendments, PSEG takes the position that these amended rules are not relevant to this discussion, and, if anything, this dispute should be guided by rules that have "long existed." *Id*. at p. 2. The trouble with PSEG's position is that former rules of discovery engagement are not remarkably different than the amended rules.

For example, the current FED. R. CIV. P. 34(b), as amended, states in part that

Unless the parties otherwise agree, or the court otherwise orders: (i) a party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request; (ii) if a request does not specify the form or forms for producing electronically stored information, a responding party must produce the information in a form or forms in which it is ordinarily maintained or in a form or forms that are reasonably usable; and (iii) a party need not produce the same electronically stored information in more than one form.

Noticeably, subsections (ii) and (iii) are recent codifications as to already established electronic discovery principles. Other than being cast as a subsection of Rule 34(b), the text of subsection (i) remains the same. Prior to December 1, 2006, parties were required to produce records as they are kept in the ususal course of business or organize and label them to correspond with the categories in the request, as evidence that nothing has changed materially as to electronic discovery. *See* FED.

*-10-*

R. CIV. P. 26(b) advisory comm. notes 2006 Amend.  Obviously, the commonsensical purpose of this mandate has always been to prevent massive dumping of documents, without form or direction, thereby alleviating an  incalculable burden upon the requesting party of searching for the proverbial needle in a haystack.  In this respect, notwithstanding Rule 34(b)'s amendments, (ii) and (iii), PSEG would still have to produce business records as kept in the regular course of business or in such a manner that Alberici could readily find a necessary document or two.  It has also been a seminal rule that the responding party would not have to satisfy the requesting party's whim to have the documents produced in various forms.

PSEG's mass production of 211,000 hard copies of records that included emails and attachments may not have served this purpose particularly well, especially when considering the identifying emails and their corresponding attachments.  Clearly these 3000 emails and related attachments were not produced in accordance with this mandate, and, as we now know have caused considerable consternation and agony for both parties, which the revised statute was attempting to avoid.  Normally, one would expect that an email and its attachment would have been kept together in the regular course of business, and the production of said documents would have followed suit. Here, the difficulty has been that there was not sufficient identifying information to match attachments with their respective email. We accept Alberici's proffer that it has spent considerable time employing different methodologies to unearth attachments to correspond with the emails it has found to be pertinent.  Attempting to reunite these documents has been nothing short of a donnybrook for Alberici.  It has been frustrated if not completely hamstrung in locating these documents.  Compounding Alberici's angst is the disadvantage it has been placed in preparing for depositions.  In essence, the first production of emails and attachments has been ineffectual.

*-11-*

Certainly, we can take some guidance from a District of Connecticut case, *CP Solutions PTE, LTD v. Gen. Elec. Co.*, 2006 WL 1272615 (D. Conn. Feb. 6, 2006), whose facts and issues are eerily similar to ours. In *CP Solutions*, hundred of thousands of pages of documents were produced by the defendant. However, thousands of emails were produced commingled, separated from their attachments, and not produced as kept in the original course of business. *Id*. at *3. The defendant therein stated that the glitch was caused by software incompatibility, however, the problem could not be solved by re-production. *Id*. The District Court found that the "[a]ttachments should have been produced with their corresponding emails" and there was no excuse, notwithstanding the software problem, for producing the emails and attachments "in a jumbled, disorganized fashion." *Id*. at *4 (citation omitted). General Electric was ordered to provide, at its expense, plaintiff with the necessary information, data or software to match the emails and attachments, if it had not already done so. *Id*. Certainly, *CP Solution* is instructive if not persuasive in terms of managing this type of discovery dispute. But, in our case there are other issues to be addressed.

One of those other issues is the extent to which all 3000 of these emails and their respective attachments are relevant to this case. PSEG's posture regarding relevancy is ambiguous. PSEG has already provided these documents as well as hundred of thousands others to Alberici raising only a general objection as to relevance. In our current discussion, in one vein, PSEG may be willing to "re-do" the production of documents but is not willing to bear the expense. However, in another vein, PSEG submits that it is likely that "a significant portion of these emails and their attachments may be irrelevant." Dkt. No. 54 at p. 4.

The scope of discovery in federal lawsuits is significant and broad. FED. R. CIV. P. 26(b)(1) states in pertinent part that:

> [p]arties may obtain discovery regarding any matter, not privileged, that is relevant
> to the claim or defense of any party . . . . For good cause, the court may order
> discovery of any matter relevant to the subject matter involved in the action . . . .
> Relevant information need not be admissible at the trial if the discovery appears
> reasonably calculated to lead to the discovery of admissible evidence.

The 2000 Amendments to this discovery statute created a two tier analysis on how information will

be disclosed. When the discovery is party controlled, relevancy is guided by whether it relates to the

claims and defenses plead. FED. R. CIV. P. 26(b)(1) advisory committee's notes 2000 Amend.

However, courts shall retain authority to grant broader and more flexible discovery. In this regard,

when the court's authority is invoked, relevancy revolves around good cause being shown and that

the requested matter is relevant to the subject matter involved in the case. *Id.*; *In Re Surety Ass'n,*

388 F.2d 412, 414 (2d Cir. 1967) ("The only restriction placed upon the matters which may be gone

into upon discovery examinations is that they be relevant."). Considering the court's inherent

powers to regulate discovery and permit discovery of information relevant to the subject matter,

discovery then, in a sense, is more expansive and liberal, guided by the reasonable needs of the case,

as what may be admitted at trial. *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir. 1992).

Generally speaking, the burden of establishing relevancy is on the party seeking the disclosure. *See*

*A.I.A. Holdings S.A. v. Lehman Bros.*, 2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000).

To be relevant, the request for information must be "germane" to the subject matter of the

claim, defenses or counterclaims, though not necessarily limited by such pleadings, and is not

controlled by whether it will be admissible at trial. *In re Surety Ass'n*, 388 F.2d at 414 ("[P]arties

should not be permitted to roam in the shadow zones of relevancy and to explore matter which does

not presently appear germane on the theory that might conceivably become so."); *Johnson v. Nyack*

*Hosp.*, 169 F.R.D. 550, 556 (S.D.N.Y. 1996). However, the demarcation between what information

*-13-*

is relevant to the claims and defenses and relevant to the subject matter cannot be defined with precision. FED. R. CIV. P. 26 advisory comm. notes 2000 Amend; *see also Shang v. Hotel Waldorf-Astoria Corp.*, 77 F.R.D. 468 (S.D.N.Y. 1978) (when defining what information is relevant to the subject matter involved in the action, there is no way to state a general rule by which boundaries can be drawn). In this vein, the requirement of relevancy with regard to discoverable matters should be construed liberally and with common sense. *In re Agent Orange Product Liability Litig.*, 98 F.R.D. 558, 559-60 (E.D.N.Y. 1983); *see also Kerr v. United States District Court,* 511 F.2d 192, 196 (9th Cir.), *aff'd* 426 U.S. 394, 397-99 (1976) (there has been explicit recognition that the question of relevancy is to be more loosely construed at the discovery stage than at trial). Thus, the court must weigh a host of factors to determine relevancy and reasonableness. *See In re Surety Ass'n*, 388 F.2d at 414 (the trial judge has considerable discretion on the issue of relevancy).

Alberici has demonstrated that these emails are relevant and germane to the subject matters of this action and specifically to its Counterclaims. Alberici argues these emails relate to its project with PSEG and their contractual relationship. Also, Alberici claims that many of these attachments relate to work done by General Electric and Sargent & Lundy, design engineers of the project in question whose performance may have interfered with Alberici's work. Dtk. No. 51 at p. 10. PSEG merely makes a blanket assertion that some of these emails may not be relevant. Such a panoptic plea is unpersuasive and unavailing. As far as we can visualize, Alberici is not requesting to roam around in the shadows of relevancy but has established that these emails and their attachments are pertinent to its claims.

Additionally, PSEG argues that the peculiarities of this case require a practical, reasonable, and fair solution. In this regard, PSEG first proposes that Alberici identify those severed attachments

that are important and necessary to its claims and defenses and then it would gather them from the raw data located in their system. Furthermore, at that moment, the parties would engage in an analysis of whether the attachments are relevant. But this approach had already been implemented with marginal success at best. When this approach was attempted in April, Alberici sought 82 attachments for 52 emails. Of that group of 82 attachments, only 23 were produced. Dkt. No. 55 at p. 4. This constitutes, at best, a 30% success rate, which is dismal by any standard. Similarly, although PSEG has produced all of these documents in hard copy format, and subsequently provided a spreadsheet to help identify the detached attachments with its parent email, Alberici found this to be a time consuming, nagging process which produced little if any positive results. In attempting to advance another approach that would yield greater success, the parties discussed sharing the PST files. It seems everyone agreed that PST files, which were undisturbed or altered by this software debacle, would be the best source for the 3000 emails and attachments. Dkt. No. 57 at p. 4. The problem is the exasperating time and expense to do so. And, when requested by Alberici, those PST files were not forthcoming from PSEG.

   We acknowledge that discovery production is rarely perfect or ideal, yet this discovery quagmire created by PSEG's vendor falls woefully short of comporting with the spirit of Rule 34. PSEG's suggestion of piecemeal identification of a "concise" cadre of emails and attachments is not a fair and practical solution. Foremost, it is not unreasonable to think that Alberici would still continue to ask for the bulk of the 3000 email attachments in any event. Furthermore, such a selective process would prolong the discovery period and eventually exacerbate the demands upon everyone's time and effort, rather than alleviate them. The hidden benefit of this process to PSEG is that Alberici could unwittingly reveal some of its thinking, strategy and impression each time it

identifies selected documents to be used for ineluctable purposes such as certain depositions.  Such revelation may trample upon the work product doctrine.  The long-held precept on discoverry should not be lost on the parties: relevancy does not turn on admissibility at trial but rather whether the disclosed item is calculated to lead to discovery of admissible evidence, and in this case, these emails and their attachments may do just that.  In the total scheme of things, re-production is warranted in this case.  Nonetheless, the larger looming question is who will pay for such re-production.

## C.  Cost Shifting for Electronic Discovery

"Too often, discovery is not just about uncovering the truth, but also about how much of the truth the parties can afford to disinter."  *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 423 (S.D.N.Y. 2002).  Our case highlights this element of affordability as the parties attempt to exhume thousands of email attachments from the dense discovery terrain that currently confronts them.

As noted by the discussion above, PSEG has provided the emails and their respective attachments in hard copy albeit not as ususally kept in the regular course of business. In fact, both parties, as responder, have provided a significant volume of hard and electronic discovery at their own cost.  As a cost saving device, under the current electronic disclosure rule, a party would not need to produce stored electronic information in more than one form.  FED. R. CIV. P. 34(b)(iii). However, in our case, said production was made in contravention of Rule 34's direction to produce the information as kept in the original course of business and in a form that is reasonably usable. FED. R. CIV. P. 34(b)(i) & (ii).  PSEG's production of 3000 emails and attachments has served neither statutory assignment.  PSEG states that if re-production of these emails is warranted, it would acquiesce to such a mandate, however, under no circumstance would it bear the expense of such a

production, which ranges, depending on the vendor used, between $40,000 to 200,000.  Similarly, Alberici notes that they bore the entire cost of an equivalent size production of documents and electronic information and was able to deliver them to PSEG without the same disappointing consequences.  Since it met its responsibilities, Alberici implores that it should not be burdened with the cost of re-production especially in light of the fact that the conflict was created by PSEG's vendors.

R    In order to resolve⁶ this problem, both parties consulted in earnest with their respective consultant to find a manageable and cost effective process for retrieving the emails and their corresponding attachments as such are kept in the ordinary course of business.  PSEG's analysis of the re-production indicates that the process was particularly time consuming and especially expensive, amounting to approximately $206,000.  Much to the contrary, Alberici's analysis found the re-production neither as draconian nor as stark as PSEG protests and contradicted the inflated cost suggested by PSEG.  Also, Alberici's vendor believes the re-production can be completed in less time as calculated by PSEG and for $37,500, approximately twenty (20) percent of PSEG's projected cost.   Notwithstanding the parties' laudable attempts to resolve this dilemma by considering these options, the matter was eventually presented to the Court.  In an attempt to strike an accord, we proposed that PSEG use Alberici's vendor, since the vendor was cheaper, but PSEG would not agree.  PSEG felt that an outside vendor, especially Alberici's vendor, would compromise other projects' proprietary information.  Responding to this reservation, this Court then proposed a comprehensive protective order with many features to shield privileged, confidential, and proprietary information from Alberici and the external world.  The proposal of a protective order was met with disfavor.  In light of PSEG's rejection and the other complications identified above, this Motion to

Compel ensued.

Some federal courts, including this Court, have followed the rule announced in *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).   "Under [the discovery] rules, the presumption is that the responding party must bear the expense of complying with discovery requests[.]" *Oppenheimer Fund*, 437 U.S. at 358 (quoted in *Rowe Entm't, Inc. v. William Morris Agency, Inc*., 205 F.R.D. 421, 428 (S.D.N.Y. 2002).   Such presumption has been the case where electronic discovery is prevalent.   *Zubulake v. USB Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) (quoting *Oppenheimer Fund*, 437 U.S. at 358).   But such a presumption may place an undue burden or cost upon the responding party, especially when it comes to electronic discovery.   In addressing electronic discovery and the rising cost to produce, common law has crafted a cost shifting scheme which is based upon FED. R. CIV. P. 26 (c).   *See Rowe Entm't Inc. v. William Morris Agency, Inc*., 205 F.R.D. at 428-29; & *Zublake v. USB Warburg LLC*, 217 F.R.D. 317-18.

PSEG seeks shelter from bearing the cost of this reproduction by invoking the discovery limitation set forth in FED. R. CIV. P. 26(b)(2)(B), which reads as follows:

> [a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2).

Here, the electronically stored information is alive, well, and preserved in 750 gigbytes by PSEG. Thus, physical accessibility to this information does not pose any trouble.   But PSEG has identified that reasonable access to this information is thwarted by the undue burden or cost.   As the Advisory

Committee Notes indicate, the presumption to such electronic discovery is justifiably challenged

when the data is "not reasonably accessible" by virtue of the substantial burden and cost. FED. R.

CIV. P. 26, advisory comm. notes to 2006 Amend.  The presence of **substantial** cost and burden in

this case is without serious contest.  The primary dispute remains as to who is going to pay for

unearthing this information.

      The parties conferred and considered other reasonable sources as alternatives to the re-

production but with limited success.  An attempt at sampling the information failed to produced the

desired result.  Using a spreadsheet to identify hard copies of the attachments proved futile.

Furthermore, Alberici is not willing to share in the expense of producing these attachments. Had

Alberici expressed a willingness to share in the expense, another viable option would have been

available.  Since all of these efforts have failed, and Alberici has met its burden of establishing good

cause for the reproduction, the Court must now balance the cost and the potential benefit of the

discovery in deciding whether to require the responding party, PSEG, to re-produce this electronic

information which is now not reasonably accessible by virtue of the cost.   FED. R. CIV. P.

26(b)(2)(C).  It is suggested that there are a number of considerations to be weighed in this balancing

scheme:

> (1) the specificity of the discovery request; (2) the quantity of information available
> from other and more easily accessed sources; (3) the failure to produce relevant
> information that seems likely to have existed but is no longer available on more
> easily accessed sources; (4) the likelihood of finding relevant, responsive information
> that cannot be obtained from other, more easily accessed sources; (5) predictions as
> to the importance and usefulness of the further information; (6) the importance of the
> issues at stake in the litigation; and (7) the parties' resources.

FED. R. CIV. P. 26 advisory comm. notes 2006 Amend.[6]

Weighing these factors, we find that the potential for discovery outweighs the cost and burden of re-production. In performing this balancing analysis, we rely upon much of our analysis above. *See supra* Part II.B. We readily find the discovery request meets the specificity requirement. We note that there is a quantity of information in easily accessible hard copy form but the manner in which the information was originally produced - attachments detached from their emails - places an unreasonable and untenable burden on the requesting party. All of the electronic information still exists. We find that Alberici has successfully demonstrated that the information it seeks is relevant and germane to the subject matter of this litigation. Attachments to emails are important and useful and may assist Alberici in presenting admissible evidence as to its Counterclaims.

The cost of retrieval in this matter is by no means cheap. We recognize that an expense of this nature can be a substantial burden. However, depending on whose experts we deemed more credible, the cost, in the scheme of this litigation, can be either sensible or exorbitant. We disagree with PSEG's assessment that the cost of re-production at $37,500, as proposed by Alberici, is as unconscionable as its proposal of $206,000. Considering the monumental production issue that confronts us, $37,500 is a significant discount when compared to PSEG's vendor's proposal and may be a bargain. Although no one wants to spend any significant amount of money on discovery, whether it be thousands of dollars or hundred of thousands of dollars, but if they have to, PSEG's access to resources rivals, if not exceeds, Alberici's claim to resources.

---

[6] The Advisory Committee Notes lists considerations to be analyzed which are derived primarily from a consolidation of those factors found in both *Rowe Entm't Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421 (S.D.N.Y. 2002) and *Zublake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003). Moreover, the preliminary step of the requesting parties' good cause inquiry duplicates a step or two in the above mentioned analysis. FED. R. CIV. P. 26 advisory comm. notes 2006 Amend.

In the final analysis, based upon the reasons stated above, the burden of production and the assumption of the cost remains with the responding party, PSEG.  The burden is being placed upon the party who will decide the extent of the expense. But we are prepared to give PSEG some options in order to meet their re-production obligation.  If PSEG does not want to assume the computer generated, re-production process, then PSEG may review the entire mass production of 2006, which was done in hard copy, and identify the attachments for each email for Alberici.  Whether this identification process entails re-producing them in hard copy or creating another specific spreadsheet for this purpose, either would suffice.  To the extent that some of the emails may be a duplication of others since they have been circulated throughout the agency, as many emails are, PSEG may identify those emails as duplication of others which would obviate the need to re-produce them.  If working with hard copies is not acceptable, then PSEG will have to access the PST files on its own and bear the cost, whatever that may be.  Nonetheless, we suggest if PSEG pursues this approach it should employ Alberici's vendor whose cost was one-fifth of PSEG's vendor.  If this method is pursued, PSEG should enter into a contract with strict rules of engagement and confidentiality provisions that would protect its privileged, confidential, and proprietary information.  If required, the Court is prepared to issue a protective order to lend all of the protection necessary to fulfill PSEG's needs. *Rowe Entm't Inc. v. William Morris Agency Inc.*, 205 F.R.D. at 428 ("To the extent that the corporate defendants' own privacy interest are at issue, they are adequately protected by [a] confidentiality order[.]").  Or, PSEG can find another vendor who would be able to extract this information at a cost far less than $200,000, which we submit can be done without further fanfare or knottiness.  Or, if PSEG has found another mechanism to re-produce these emails at a cost savings, exclusive of requiring Alberici to expend consideration time and resources, we invite it to

do so.  All other options aside, it seems that using Alberici's vendor would be most prudent but the choice of vendors to extract the information and complete the email distribution rests with PSEG.

### III.  CONCLUSION

But for PSEG's vendor creating this email attachment fiasco, we would not be having this discussion.  Without question, attachments should have been produced with their corresponding emails as such are kept in the ususal course of business.  PSEG chose to provide the emails and attachments in this disassembled manner albeit unbeknowst to it at the time of production.  Whether created by a software incompatibility or malfunction, such deficiency does not provide a sufficient excuse from presenting an important aspect of discovery in a convoluted fashion.  And, Alberici should not be resigned to accept a flawed discovery process. For the reasons stated herein, it is hereby

**ORDERED**, that PSEG's Motion for a Protective Order is **denied**; and it is further

**ORDERED**, that Alberici's Motion to Compel is **granted**; and it is further

**ORDERED**, that PSEG must re-produce its emails with its corresponding attachments at its cost and consistent with this Order; and it is further

**ORDERED**, that dispositive motions shall be stayed until discovery is completed and the parties have conferred with this Court; and it is further

**ORDERED**, that parties provide the Court with dates and times of their availability for a telephone conference to consider the remaining scope of discovery, set dates for expert disclosure, and set a final discovery deadline.

**IT IS SO ORDERED**.

Date:   September 7, 2007
        Albany, New York

R                       F

_____
RANDOLPH F. TREECE
United States Magistrate Judge